**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
E-mail: swestcot@bursor.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN FERRIZ, individually and on behalf of all others similarly situated, | Case No.   2:24-cv-8622 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| RED ROOF INNS, INC., and RED ROOF FRANCHISING, LLC, | |
| Defendants. | |

Plaintiff Martin Ferriz ("Plaintiff") brings this action individually and on behalf of all other persons similarly situated (the "Class Members"), against Defendants Red Roof Inns, Inc. and Red Roof Franchising, LLC (collectively "Red Roof" or "Defendants").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all persons in California who have a Facebook account and booked travel arrangements on www.redroof.com (the "Website").

2.      Red Roof is an American economy hotel chain that owns and operates the Website, which travelers use to book overnight stays at Red Roof properties.[1] *See*



**Figure 1:** Screenshot of the Website (https://www.redroof.com/) prepared by Plaintiff's counsel on August 21, 2024

Figure 1.

---

[1] The Red Roof Portfolio includes Red Roof Inn, Red Roof Plus+, HometownStudios, and The Red Collection.

3.     Privacy is a crucial consideration when booking travel online, as it safeguards personal information from unauthorized access and misuse.  With the increasing reliance on digital platforms for making travel arrangements, consumers often share sensitive data, including personally identifiable information and travel itineraries disclosing travelers' future plans and whereabouts.  Maintaining privacy fosters trust between consumers and travel providers, and prevents unauthorized disclosure of this personal and sensitive information.

4.     Unbeknownst to travelers, Defendants aids, employs, agrees with, and conspires with Meta, Inc.[2] to intercept confidential communications sent and received by Plaintiff and Class Members, including communications that contain sensitive and confidential information (i.e., "guest records," as defined by Cal. Civil Code § 53.5(c)).

**PARTIES**

5.     Plaintiff Ferriz is an adult citizen of the state of California, domiciled in Pomona, California.

6.     Plaintiff has actively maintained a Facebook account with Meta at all times relevant prior to and after booking his stay through the Website.

7.     Plaintiff has booked several overnight stays at Red Roof locations.  For example, in or around February 2024, Plaintiff visited the Website to book a stay at Defendants' San Dimas location.  While navigating the Website, Plaintiff inputted a destination and the dates of his stay to look for overnight accommodations.  Plaintiff selected a room at Red Roof's San Dimas location and began the checkout process with the understanding that his sensitive trip details would not be shared with third parties such as Meta.

---

[2] In October 2021, Facebook, Inc. changed its name to Meta Platforms, Inc. Unless otherwise indicated, Facebook, Inc. ("Facebook") and Meta Platforms, Inc. are referenced collectively as "Meta."

8.      Pursuant to the systematic process described herein, Defendants assisted Meta with intercepting Plaintiff's communications, including those that contained personally identifiable information, and related "guest records."  This information includes the Defendants assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization.

9.      By failing to receive the requisite consent, Defendants breached their duties of confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and sensitive trip details (i.e. "guest records" under Cal. Civil Code § 53.5).

10.     Defendant RedRoof Inns, Inc. is a Delaware Corporation with its corporate headquarters at 7815 Walton Parkway, New Albany, Ohio 43054.

11.     Defendant RedRoof Franchising, LLC is a Delaware limited liability company with its corporate headquarters at 7815 Walton Parkway, New Albany, Ohio 43054.

12.     Defendants develop, own, and operate the Website.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of different states than Red Roof.

14.     This Court has personal jurisdiction over Red Roof.  This Court has personal jurisdiction over Defendants pursuant to Ninth Circuit precedent because of its contacts with the forum state.  First, by integrating the code that allowed a third party to wiretap communications, Defendants acted intentionally.  Second, Defendants knew that the harm would be felt in California because Defendants allowed consumers to book overnight stays at properties within the state of

California.  Third, Defendants expressly aimed its conduct at California because Defendants, in the regular course of business, allow travelers to book trips and stay overnight at the several properties it owns throughout the state of California.  Finally, Plaintiff and Class Members were harmed in California because that is where Meta —as enabled by Defendants—wiretapped Plaintiff and Class Members. Collectively, such factors are sufficient for the Court to exercise personal jurisdiction over Defendants. *See Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1094– 95 (9th Cir. 2023), *cert. denied* 144 S. Ct. 693 (2024).

15.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

### A.    California Information Privacy Act ("CIPA")

16.    The California Information Privacy Act ("CIPA"), California Penal Code section 630, *et seq.*, prohibits aiding or permitting another person to willfully— and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

17.    In enacting CIPA, the California Legislature expressly recognized "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . .  has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

18.    Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has

> been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

19.     To establish liability under California Penal Code section 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things

mentioned above in this section.

20.    Under California Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**B.    California Civil Code § 53.5**

21.    In 2018, the California Legislature enacted § 53.5 of the California Civil Code, to bring California citizens greater protections regarding travel.  More specifically, the Legislature recognized the importance of protecting personal information and travel information:

> (h) Protecting the privacy of personal information promotes consumer confidence and encourages both residents and visitors to travel to and within California and to patronize California businesses.
>
> (i) Therefore***, it is the intent of the Legislature to further Californians' right to privacy by ensuring that the personal information disclosed by patrons of lodging establishments and bus companies is used for the intended business purposes and not improperly disclosed***.

Privacy—Consumer Protection—Traveling, 2018 Cal. Legis. Serv. Ch. 853 (S.B. 1194) (WEST)(emphasis added).

22.    According to § 53.5, a "guest record" maintained by an owner or operator of an inn, hotel, motel, lodginghouse, or other similar accommodations is confidential.  Consequently, an owner or operator of such accommodations "shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order."  Cal. Civil Code § 53.5(a).

23.    Per Cal. Civil Code § 53.5(c):

> "Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security

number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

24.    Consequently, "guest records" identifying Website users as Red Roof guests, boarders, occupants, lodgers, customers, or invitees are confidential, under California law.

**C.    Defendants' Website**

25.    Red Roof is a hotel and lodging chain with over 700 locations in the United States, with more than a dozen locations in California.  Red Roof offers prospective guests the opportunity to book a stay through using the Website, which may be accessed on mobile devices and desktop computers.

26.    Defendants also offer a mobile application guests may use to book their stay.

27.    At all relevant times, Defendants' Website hosted code for the Meta Pixel (described *infra*). To book a stay at a Red Roof property, prospective guests must first enter their destination and the dates of their stay.  *See* Figure 2.  Upon



**Figure 2:** Screenshot of the Website (https://www.redroof.com/) prepared by Plaintiff's counsel on August 21, 2024

entering this information, prospective guests are taken to a page to select the property, room, and room rate.

28.     Guests are then prompted to enter their name, email address, phone number, address, and payment information (i.e. card number, expiration date, CVV number) in order to checkout and confirm their reservation at one of Defendants'



**Figure 3:** Screenshot of the Website (https://www.redroof.com/) prepared by Plaintiff's counsel on August 21, 2024



**Figure 4:** Screenshot of the Website (https://www.redroof.com/) prepared by Plaintiff's counsel on August 21, 2024

properties.  *See* Figure 3, Figure 4.

### D.    The Meta Pixel

29.    Facebook describes itself as a "real identity platform,"[3] meaning users are allowed only one account and must share "the name they go by in everyday life."[4]  To that end, when creating an account, users must provide their first and last name along with their birthday and gender.[5]

30.    Meta owns Facebook.com and generates revenue by selling advertising space on that website, and other applications it owns, like Instagram.[6]  In 2021, Facebook generated $117 billion in revenue.[7]  Roughly 97% of that came from selling advertising space.[8]

31.    Meta sells advertising space by highlighting its ability to target users.[9] Meta can target users so effectively because it surveils user activity both on and off its site.[10]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[11]  Meta compiles this information into a generalized dataset called "Core Audiences," which

---

[3] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, Wall. St. J. (Oct. 21, 2021).

[4] META, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[5] META, SIGN UP, https://www.facebook.com/

[6] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[7] META, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[8] *Id.*

[9] META, WHY ADVERTISE ON FACEBOOK INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[10] META, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[11] META, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

---

advertisers use to apply highly specific filters and parameters for their targeted advertisements.[12]

32.    Advertisers can also build "Custom Audiences."[13]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[14]  With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[15]

33.    Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Meta's "Business Tools."[16]

34.    As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Meta, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[17]

---

[12] META, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[13] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[14] *Supra* note 12.

[15] META, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[16] META, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; META, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[17] META, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

---

35.    Meta's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

36.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata.[18]    However, Meta's Business Tools can also track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[19]    Advertisers can even create their own tracking parameters by building a "custom event."[20]

37.    One such Business Tool is the Meta Tracking Pixel.  Meta offers this piece of code to advertisers, like Red Roof, to integrate into their websites.  As the name implies, the Meta Tracking Pixel "tracks the people and type of actions they take."[21]    When a user accesses a website hosting the Meta Tracking Pixel, Meta's software surreptitiously directs the user's browser to simultaneously send a separate message to Meta's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data the Pixel is configured to collect.  This transmission is initiated by Meta code and concurrent with the communications with the host website.  Two sets of code are thus

---

[18] *See* META, META PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* META, BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[19] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[20] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[21] META, RETARGETING, https://www.facebook.com/business/goals/retargeting.

---

automatically run as part of the browser's attempt to load and a website: the
website's own code, and Meta's embedded code.

38.    An example illustrates the point.  Take an individual who navigates to
https://www.redroof.com/ and enters information into the "Guest Information"
section.  *See* Figure 3.  Once the individual enters in the information, the individual's
browser sends a GET request to Red Roof's server requesting that server to load the
particular webpage.  Because Red Roof utilizes the Meta Tracking Pixel, Meta's
embedded code, written in JavaScript, sends secret instructions back to the
individual's browser or mobile phone, without alerting the individual that this is
happening.  Meta causes the browser to secretly and simultaneously duplicate the
communication with Red Roof, transmitting it to Meta's servers alongside additional
information that transcribes the communication's content and the individual's
identity.  This entire process occurs within milliseconds.

39.    In other words, when a user communicates with Red Roof's Website,
those communications are simultaneously and contemporaneously duplicated and
sent to Meta at the same time as they are being sent to Red Roof.  Thus, Meta's
interception of these communications occurs "in transit."  *See, e.g.*, *In re Facebook
Internet Tracking Litigation.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an
entity to engage in the unauthorized duplication and forwarding of unknowing users'
information would render permissible the most common methods of intrusion…");
*Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019)
("Even if the browser caused a parallel signal to be sent to NaviStone, that
intervention happened while the signal was already in transit from Revitch's device.
Section 631's protections extend explicitly to the beginnings and ends of
communication . . ."); *James v. Walt Disney Co.*,
--- F. Supp. 3d ---, 2023 WL 7392285, at *15-16 (N.D. Cal. Nov. 8, 2023) (finding
in-transit interception was alleged based on a similar process to the one alleged
herein).

40.     After collecting and intercepting this information, Meta processes it,
analyzes it, and assimilates it into datasets like Core Audiences and Custom
Audiences.  In order to engage in the above-described processing, analysis and
assimilation, on information and belief, Meta has to view the information being
processed, analyzed and assimilated.  As such, upon information and belief, Meta
regularly viewed and used Plaintiff and Class Members' communications that it
intercepted via the Meta Pixel.

41.     Meta's other Business Tools function the same.  For mobile
applications, advertisers can utilize the Meta SDK, which contains "component
SDKs," like the App Events API, allowing advertisers to track events on their mobile
apps so they can "measure ad performance and build audiences for ad targeting."[22]

42.     Advertisers can also utilize the "Conversions API."  The Conversions
API lets advertisers circumvent a user's choice to exercise privacy controls.[23]  More
technically, the Conversions API is Meta code that advertisers can implement server-
side.[24]

43.     Because it operates server-side, the Conversions API ignores users'
decision to opt out of tracking, collecting the same data it would otherwise through
"a connection between an advertiser's server and Meta's Conversion API
endpoint."[25]

44.     When the Conversions API collects "[s]erver events," those data points
are "linked to a Meta Pixel ID and are processed like web events sent via Pixel."[26]
As with the Meta Tracking Pixel, the Conversions API intercepts these

---

[22] META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[23] META, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api.  This refers to device specific privacy controls.

[24] *Id.*

[25] *Id.*

[26] *Id.*

---

communications contemporaneously and surreptitiously. [27]  Meta "recommend[s] that advertisers implement the Conversions API alongside their Meta Pixel and follow other best practices." [28]

45.    Meta confirms, in its "Meta Business Tools Terms," [29] that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendants.  For instance, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products."[30]  In other words, Meta can use the wiretapped information for its own "research and development," and to "protect" its own products and services.[31]

46.    Meta also can and does connect all information it intercepts to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products." [32]

47.    Further, Meta can and does use the event data to help websites like Defendants' "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products." [33]

---

[27] META, HANDLING DUPLICATE PIXEL AND CONVERSIONS API EVENTS, https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events/ ("Once your event fulfills both conditions, we keep the first one and remove the following one.  If a server and browser event arrive at approximately the same time (within 15 seconds of each other), we favor the browser event.").

[28] *Id.*

[29] META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

48.     Finally, Meta can and does use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products." [34]

49.     Thus, Meta uses the information it wiretaps for purposes other than simply providing a recording to its customers, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

50.     The Meta Pixel is employed on the Defendants' website in the manner described throughout this Complaint

**E.     Defendants' Enable Meta, Through the Meta Pixel, to Intercept Plaintiff's and Class Members' Communications with Defendants.**

51.     Through the Meta Tracking Pixel, Defendants shared customers' online activity, including their sensitive and confidential information and search results, including information related to their guest records and travel information.

52.     For example, as alleged above, when a customer entered https://www.redroof.com/ and began booking their hotel, Defendants' transmitted

---

[34] *Id.*

information relating to the specific customer's trip to Meta. *See* Figure 5 (example showing the transmission of the travel destination and trip dates to Meta).



**Figure 5:** Image showing the Website transmitting check-in date, check-out date, and city to third-party Meta via the Meta Tracking Pixel

53.     Each time Red Roof sent this activity data, it also disclosed customers' personally identifiable information, including their Facebook ID. A Facebook ID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. Notably, while Meta can easily identify any individual on its Facebook platform with only their unique Facebook ID, so too can any ordinary person who comes into possession of a Facebook ID. Meta admits as much on its website. Indeed, ordinary persons who come into possession of the Facebook ID can connect to any Facebook profile.

54.     A user who accessed the Website while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contained that user's unencrypted Facebook ID.

55.     When a visitor's browser had recently logged out of an account, Facebook compelled the visitor's browser to send a smaller set of cookies.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                          16

56.     One such cookie was the "fr cookie" which contained, at least, an encrypted Facebook ID and browser identifier.[35]  Facebook, at a minimum, used the fr cookie to identify users.[36]

57.     If a visitor had never created an account, an even smaller set of cookies was transmitted.

58.     At each stage, Red Roof also utilized the "_fbp cookie," which attached to a browser as a first-party cookie, and which Facebook used to identify a browser and a user.[37]

59.     The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[38] Otherwise, the c_user cookie is cleared when the browser exits.[39]

60.     The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[40] If that happens, the time resets, and another 90 days begins to accrue.[41]

61.     The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[42] If that happens, the time resets, and another 90 days begins to accrue.[43]

---

[35] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[36] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[37] Id.

[38] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[39] Id.

[40] See id.

[41] Confirmable through developer tools.

[42] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[43] Also confirmable through developer tools.

62.    The Facebook Tracking Pixel used both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website.[44] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, www.facebook.com.[45] The _fbp cookie was always transmitted as a first-party cookie. A duplicate _fbp cookie was sometimes sent as a third-party cookie, depending on whether the browser had recently logged into Facebook.

63.    Facebook, at a minimum, used the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles. Red Roof sent these identifiers alongside the event data.

64.    The agreement for Defendants' to aid in Meta's wiretapping of Plaintiff and Class Members' browsing information from the Website is done for the purpose of improperly increasing the advertising efficiency and, by extension, profits of both parties.

65.    Further, Red Roof also assisted Meta with intercepting other protected information, including consumers first and last names, email address, phone number, and address.

## **CLASS ALLEGATIONS**

66.    **Class Definition:** Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and other similarly situated individuals defined as all persons in California who have a Facebook account and who booked travel arrangements on www.redroof.com (the "Class").

67.    Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

---

[44] PC MAG, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[45] PC MAG, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

68.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

69.     Excluded from the Class are Defendants; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendants have a controlling interest; any officer, director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned, their spouse and immediate family members; and members of the judge's staff.

70.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the Class. However, given the popularity of Defendants' Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

71.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

        (a)    whether Defendants' collected Plaintiff's and the Class's personal information and travel details (i.e. "guest records");

        (b)    whether Defendants' unlawfully disclosed and continues to disclose its users' personal information and travel details in violation of the CIPA;

        (c)    whether Defendants' disclosures were committed knowingly;

        (d)    whether Defendants' disclosed Plaintiff's and the Class's personal information and travel details without consent;

(e)    whether Defendants intentionally recorded Plaintiff and Class
Members' communications under the CIPA; and

(f)    whether Plaintiff and Class members' personal information and
travel details are content under the CIPA.

72.    **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of
those of the Class because Plaintiff, like all members of the Class, navigated to
Defendants' Website to book his stay and had his sensitive information collected and
disclosed by Red Roof without his consent.

73.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is
represented by qualified and competent counsel who are highly experienced in
complex consumer class action litigation, including litigation concerning the CIPA.
Plaintiff and his counsel are committed to vigorously prosecuting this class action.
Moreover, Plaintiff is able to fairly and adequately represent and protect the interests
of the Class. Neither Plaintiff nor his counsel have any interest adverse to, or in
conflict with, the interests of the absent members of the Class. Plaintiff has raised
viable statutory claims of the type reasonably expected to be raised by members of
the Class, and will vigorously pursue those claims. If necessary, Plaintiff may seek
leave of this Court to amend this Class Action Complaint to include additional
representatives to represent the Class, additional claims as may be appropriate, or to
amend the definition of the Class to address any steps that Defendants took.

74.    **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to
other available methods for the fair and efficient adjudication of this controversy
because individual litigation of the claims of all members of the Class is
impracticable. Even if every member of the Class could afford to pursue individual
litigation, the court system could not. It would be unduly burdensome to the courts in
which individual litigation of numerous cases would proceed. Individualized
litigation would also present the potential for varying, inconsistent or contradictory
judgments, and would magnify the delay and expense to all parties and to the court

system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

### COUNT I
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 631**

75.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

76.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  CIPA begins with its statement of purpose – namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ."  Cal. Penal Code § 630.

77.    A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any

purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

78.    Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

79.    To avoid liability under § 631(a), a defendant must show it had the consent of **all** parties to a communication.

80.    At all relevant times, Red Roof aided, agreed with, and conspired with Meta to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website.  These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

81.    Red Roof, when aiding and assisting Meta with wiretapping, intended to help Meta learn some meaning of the content in the URLs and the content the visitor requested.

82.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Meta Pixel falls under the broad catch-all category of "any other manner":

(a) The computer codes and programs Meta used to track Plaintiff's and Class Members' communications while they were navigating the Website;

(b) Plaintiff's and Class Members' browsers;

(c) Plaintiff's and Class Members' computing and mobile devices;

(d) Meta's web and ad servers;

(e) The web and ad-servers from which Meta tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Website;

(a) The computer codes and programs used by Meta to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit the Website; and

(b) The plan Meta carried out to effectuate their tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit musely.com.

83.   The private travel communication information that Defendants transmitted using the Pixels, such as information regarding the dates of the trip, number of guests, user name, etc., constituted guest records under California Civil Code § 53.5.

84.   As demonstrated hereinabove, Red Roof violated CIPA by aiding and permitting third parties (i.e. Meta) to receive its guests' online communications through the Website without their consent.

85.   As a result of the above violations, Red Roof is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages.  Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

86.   Under the statute, Red Roof is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Red Roof in the future.

## COUNT II
### Invasion of Privacy Under California's Constitution

87.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the members of the Class.

88.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and sensitive travel information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

89.    At all relevant times, by using the Meta Pixel to record and communicate guests' information alongside their sensitive travel details, Red Roof intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

90.    Plaintiff and Class Members had a reasonable expectation that their communications, identities, health information, and other data would remain confidential, and that Red Roof would not install wiretaps on the Website.

91.    Plaintiff and Class Members did not authorize Red Roof to record and transmit Plaintiff's and Class Members' private guest records alongside their personally identifiable information.

92.    This invasion of privacy was serious in nature, scope, and impact because it related to Plaintiff and Class Members protected "guest records.". Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

93.    Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, request judgment against Red Roof and that the Court grant the following:

(a)    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class, and Plaintiff's attorneys as Class Counsel to represent the Class.

(b)    For equitable relief enjoining Red Roof from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

(c)    For an order finding in favor of Plaintiff and the Class, on all counts asserted herein;

(d)    For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

(e)    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

(f)    For prejudgment interest on all amounts awarded; and

(g)    Such other and further relief as this Court may deem just and proper.

## **<u>JURY TRIAL DEMANDED</u>**

Plaintiff demands a trial by jury on all claims so triable.


Dated:  October 7, 2024                    **BURSOR & FISHER, P.A.**

By:   */s/ Sarah N. Westcot*
                    Sarah N. Westcot

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
E-mail: swestcot@bursor.com

*Counsel for Plaintiff*